**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PATRICIA S.,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀**Plaintiff,**⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀**No. 21 C 2353**
⠀⠀⠀**v.**⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀**Magistrate Judge Finnegan**
**KILOLO KIJAKAZI, Acting**⠀⠀⠀)
**Commissioner of Social Security,**[1]⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀**Defendant.**⠀⠀⠀⠀)

## ORDER

⠀⠀⠀⠀Plaintiff Patricia S. seeks to overturn the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

⠀⠀⠀⠀Plaintiff protectively filed for DIB on March 7, 2019, alleging disability since December 13, 2017 due to: 8 surgeries on the arms and hands; a herniated disc in the back; a hiatal hernia; carpal tunnel in the hands; crooked toes causing pain when walking; inability to sit or stand for long periods; loss of function in the hands; anemia; high blood

---

[1]⠀⠀⠀⠀Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

pressure; and anxiety. (R. 135, 162). Born in 1967, Plaintiff was 50 years old as of the alleged disability onset date making her a person closely approaching advanced age (age 50-54). 20 C.F.R. § 404.1563(d). She received her GED and lives with her sister. (R. 163, 1339). Plaintiff spent 16 years working as a bakery clerk from January 2000 to January 2016, then became a home health aide. (R. 163). Though Plaintiff engaged in home health care work after the December 2017 alleged disability onset date, her earnings in 2018, 2019, and 2020 did not rise to the level of substantial gainful activity. (R. 23).

The Social Security Administration denied Plaintiff's application initially on August 16, 2019, and again upon reconsideration on December 19, 1919. (R. 45-72). She filed a timely request for a hearing and appeared before administrative law judge James E. MacDonald (the "ALJ") on October 21, 2020.[2] (R. 1327). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Adolph Cwik (the "VE"). (R. 1329-69). On November 18, 2020, the ALJ found that Plaintiff's lumbar degenerative disc disease, hypertension, obesity, migraine headaches, bilateral carpal tunnel syndrome, degenerative joint disease of the bilateral hands, and asthma are all severe impairments, but that they do not alone or in combination with her non-severe impairments meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23-26).

After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work involving: occasional pushing, pulling, lifting, and carrying of up to 20 pounds; frequent pushing,

---

[2]     The hearing was held telephonically due to the COVID-19 pandemic.

pulling, lifting, and carrying of up to 10 pounds; sitting, standing, and walking for 6 hours in an 8-hour workday with normal breaks; no climbing of ladders, ropes, scaffolds, or stairs; occasional climbing of ramps; occasional balancing, stooping, kneeling, crouching, and crawling; frequent handling, fingering, and feeling with both hands; exposure to a moderate noise environment as defined in the Selected Characteristics of Occupations; no exposure to moving mechanical parts, unprotected heights, vibration, or wetness; and occasional exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 26-32). The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could not perform Plaintiff's past work as a bakery clerk or home health aide, but could perform a significant number of other jobs available in the national economy such as electronics assembler, office helper, and hammer mill operator. (R. 32-33). The ALJ thus found Plaintiff not disabled at any time from the December 13, 2017 alleged disability onset date through the date of the decision. (R. 33). The Appeals Council denied Plaintiff's request for review on March 19, 2021. (R. 1-5). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009); *Payne v. Colvin*, 216 F. Supp. 3d 876, 880 (N.D. Ill. 2016).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in weighing the opinions of record; (2) made a flawed RFC determination that fails to account for all of her limitations; and (3) improperly discounted her subjective statements regarding her symptoms. As discussed below, this Court finds that the ALJ did not commit reversible error and his decision is supported by substantial evidence.

3

## DISCUSSION

**A.     Standard of Review**

A claimant is disabled within the meaning of the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether [the claimant] has a severe impairment or a combination of impairments that is severe; (3) whether [the claimant's] impairments meet or equal any impairments listed as conclusively disabling; (4) whether [the claimant] can perform . . . past work; and (5) whether [the claimant] is capable of performing any work in the national economy." *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021) (citing (citing 20 C.F.R. § 404.1520(a)-(g)). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Id.*

In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will uphold the ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and build[s] an accurate and logical bridge from the evidence to [the ALJ's] conclusion." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). Substantial

4

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).

## B.    Analysis

### 1.    Opinion Evidence

Plaintiff argues that the case must be reversed or remanded because the ALJ improperly rejected the opinion from her treating pain management specialist Ryan Unger, M.D.  Since Plaintiff filed her claim in March 2019, the treating source rule used for claims filed before March 27, 2017 does not apply.  This means the ALJ was not required to "defer or give any specific evidentiary weight" to any medical opinion, including a treating physician's opinion.  20 C.F.R. § 404.1520c(a).  *See also* Social Security Administration, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819 (Jan. 18, 2017).  Instead, the ALJ was required to "evaluate the persuasiveness of each medical opinion based on certain factors:  (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors, including the source's familiarity with other evidence in the claim or an understanding of Social Security disability policies and requirements."  *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)).  An ALJ must explain how he considered the first two factors (supportability and consistency) and may but is not required to explain his consideration of the other factors.  20 C.F.R. § 404.1520c(b)(2).  "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion."  *Michelle D.*, 2022 WL 972280, at *4 (citing 20 C.F.R. §

404.1520c(c)(1)).  "Consistency assesses how a medical opinion squares with other evidence in the record."  *Id.* (citing 20 C.F.R. § 404.1520c(c)(2)).

In his April 4, 2019 opinion, Dr. Unger stated that Plaintiff experiences sharp, dull pain in the low back that intermittently radiates into the legs.  The objective signs include decreased lumbar range of motion and an MRI (not found in the record) showing degenerative disc disease, disc bulging, and spondylosis.  (R. 641).  Dr. Unger opined that Plaintiff can: walk for only two blocks without rest or severe pain; sit for one hour at a time and stand for 15 minutes at a time before needing to change position; sit, stand, and walk for a total of less than two hours in an 8-hour workday; frequently lift and carry less than 10 pounds; occasionally lift and carry 10 pounds; rarely twist, stoop, crouch, climb ladders, or climb stairs; and use her hands for no more than 25% of the workday. (R. 642, 643).  Plaintiff must shift positions at will, and needs to take three to four unscheduled 15-minute breaks per day due to muscle weakness, chronic fatigue, pain/paresthesias, and numbness.  (R. 642).  Dr. Unger estimated that Plaintiff would be off task for 25% or more of the workday and would likely be absent from work four days per month.  (R. 643-44).

The ALJ found Dr. Unger's opinion unpersuasive because it was inconsistent with the record as a whole and not supported by the doctor's own treatment notes.  (R. 31). The Court finds no error in this assessment.  On March 9, 2017, approximately nine months before the December 13, 2017 alleged disability onset date, Plaintiff saw internist Mary Kanashiro, M.D., for a routine check-up.  (R. 511).  An exam revealed lower back pain and shoulder pain, but Plaintiff exhibited no motor deficits or paresthesias and had full hand strength and dexterity, including the ability to pick up a spoon.  (R. 512, 515-16).

6

At an appointment with pain specialist Craig Malk, M.D., on May 24, 2017, Plaintiff reported that she had undergone bilateral carpal tunnel and cubital tunnel surgeries in the past, but on exam there were no documented problems with her hands. (R. 497-98).[3] Though Plaintiff had abnormal lumbar range of motion and extension, her gait was normal, a straight leg raise test was negative bilaterally, lumbar flexion was normal, and there was no muscle pain or joint tenderness. (R. 498). Dr. Malk assessed low back pain, lumbar spondylosis, and myofascial pain syndrome. He instructed Plaintiff to continue taking diclofenac (an anti-inflammatory), Flexeril, and gabapentin, and referred her for physical therapy.

On July 8, 2017, Efesomwan Aisien, M.D., conducted an Internal Medicine Consultative Examination of Plaintiff in connection with a previous disability application. Plaintiff was able to get on and off the exam table with no difficulty and walk more than 50 feet without support. At the same time, she could not squat, stand on each foot alone, or heel/toe walk. (R. 27, 478). Straight leg raise tests were positive bilaterally, and Dr. Aisien noted reduced range of motion in the shoulders and wrists. He was unable to assess range of motion in the hips or lumbar spine due to pain. (*Id.*). With respect to Plaintiff's hands, she had reduced grip strength and reduced ability to grasp and manipulate objects, and she could not fully extend her hands, make fists, or oppose fingers. (*Id.*). In addition, Plaintiff had severe difficulty opening a door using a knob, squeezing a blood pressure cuff bulb, picking up coins, picking up and holding a cup, picking up a pen, buttoning/unbuttoning, zipping/unzipping, and tying shoelaces. (R. 27,

---

[3]    The record does not contain any treatment notes related to carpal tunnel or cubital tunnel surgery.

484).  Dr. Aisien assessed chronic low back pain and bilateral carpal tunnel syndrome. (R. 479).

Four days later, on July 12, 2017, Plaintiff started seeing Dr. Unger for pain management.  At that exam, Plaintiff presented with abnormal lumbar range of motion and extension, and positive lumbar facet loading bilaterally.  (R. 501).  But her gait was normal; straight leg raise tests were negative; lumbar flexion was normal; there was no tenderness to palpation; and a Faber test was negative.  Plaintiff also had normal strength, sensation, and range of motion in her shoulders, elbows, hands, hips, knees, ankles, and feet, with no muscle pain, muscle wasting, joint tenderness, or atrophy. Cervical range of motion was similarly normal.  Dr. Unger assessed back pain, low back pain, myofascial pain syndrome, and lumbar spondylosis with myelopathy, and scheduled Plaintiff for a lumbar epidural steroid injection ("LESI").  (*Id.*).

Plaintiff returned to Dr. Kanashiro on July 18, 2017 and had a normal physical exam with full range of motion in all joints, intact sensation, and full muscle strength.  (R. 27, 531).  Four days later, however, during a July 22, 2017 consultative psychological assessment in connection with her disability application, Plaintiff was walking with a cane and wearing a waist support.  (R. 488).  Shortly thereafter, on July 25, 2017, Dr. Unger administered an LESI at L4-L5.  (R. 27, 503-04).  During a follow-up appointment on August 16, 2017, Plaintiff reported 80% relief from the injection and was "doing very well." (R. 28, 505, 567).  An examination that day was largely unchanged with some abnormal lumbar findings but: normal gait (with no mention of a cane); normal lumbar flexion; negative straight leg raise tests; no tenderness to palpation; negative Faber test; normal cervical range of motion; no muscle pain or joint tenderness; and normal strength and

range of motion in the hands, shoulders, elbows, hips, knees, ankles, and feet. (R. 505, 567). Dr. Unger documented identical results on August 30, 2017. (R. 570).

On September 12, 2017, Dr. Unger administered another LESI at L5-S1. (R. 572-73). The following month, on October 10, 2017, Dr. Kanashiro noted that Plaintiff ambulated normally and had full range of motion in all joints, normal sensation, and full muscle strength. (R. 539). When Plaintiff returned to Dr. Unger on November 30, 2017, she reported 75% relief from the LESI for about two months. (R. 28,574). On exam, Plaintiff had abnormal and decreased lumbar range of motion with pain in all planes, abnormal lumbar extension, and positive lumbar facet loading bilaterally. The rest of the exam was normal, however, including: a normal gait; negative straight leg raise; normal lumbar flexion; no tenderness to palpation; negative Faber test; normal shoulders, elbows, hands, hips, knees, ankles, feet, and cervical spine; and no muscle pain, wasting, atrophy, or joint tenderness. (R. 28, 575).

Over the next two months, Dr. Unger administered two more LESIs and bilateral carpal tunnel injections. (R. 577-78, 582). By February 1, 2018, Plaintiff had achieved 50% relief from the LESIs and 75% relief from the carpal tunnel injections with decreased numbness and tingling. (R. 28, 586). A physical exam likewise showed improvement. Though Plaintiff still exhibited abnormal lumbar extension, all other findings were normal. (R. 28, 587). On February 28 and March 7, 2018, Plaintiff received left L3-S1 diagnostic facet medial nerve branch blocks and reported 80% relief for six hours. (R. 28, 589, 591, 594). Exams on April 19, 2018, May 17, 2018, and June 28, 2018 remained normal aside from some difficulty with lumbar extension. (R. 599, 602, 609).

9

On July 11, 2018, Plaintiff underwent a right L3-S1 facet medial nerve branch radiofrequency ablation ("RFA"). (R. 28, 611). This provided 75% relief as of August 2, 2018, and Plaintiff's exam that day continued to be normal with the exception of lumbar extension. (28, 614). During an annual exam with Dr. Kanashiro on August 14, 2018, Plaintiff denied having any joint pain, back pain, stiffness, or muscle weakness, and an exam showed full range of motion in all joints, normal muscle strength, and normal sensation. (R. 555-56). Plaintiff returned to Dr. Unger on September 20, 2018 and reported 50% relief from an L4-L5 LESI administered on August 15, 2018. (R. 616-17, 618). A physical exam was once again almost entirely normal but for some abnormality in lumbar extension. (R. 619).

Plaintiff underwent left and right L3-S1 RFAs in October and December 2018 and by January 3, 2019, she was reporting 80% relief. (R. 623-24, 628-29). Exams throughout that period and up through February 28, 2019 were unchanged and almost entirely normal. (R. 28, 565, 626, 631, 634).[4] Notwithstanding all of these essentially normal exams, Dr. Unger opined on April 4, 2019 that Plaintiff can barely sit, stand, walk, lift, or use her hands, fingers, and arms. (R. 642-44). Shortly thereafter on April 25, 2019, Plaintiff received additional bilateral carpal tunnel injections that gave her 50% relief as of May 23, 2019. (R. 770, 772). Her exam was still mostly unremarkable: normal cervical spine; negative straight leg raise tests; normal lumbar flexion; normal gait; normal lumbar range of motion; negative lumbar facet loading; no tenderness to palpation; negative Faber test; normal strength, sensation, and range of motion in the shoulders, elbows,

---

[4] Plaintiff notes that on November 26, 2018, Arthur H. Katz, M.D., an ear, nose, and throat specialist ("ENT"), assessed her with an "impairment of balance." (Doc. 21, at 11; R. 1205). From December 10, 2018 onward, however, Dr. Katz never again mentioned that diagnosis. (R. 1209, 1213, 1217-18, 1221-22).

hands, hips, knees, ankles, and feet; and no muscle pain, joint tenderness, atrophy, or wasting. (R. 773). Though there was no mention of a need for a cane in the notes, Dr. Unger prescribed one to Plaintiff. (R. 1326). He also prescribed a back brace for lumbar support (which was referenced in the notes). (R. 28-29, 774).

Approximately two weeks later on June 8, 2019, Plaintiff had another internal medicine consultative exam, this time with Muhammad Rafiq, M.D. According to Dr. Rafiq's report, Plaintiff's condition had markedly deteriorated from just two weeks prior: she was unable to get on and off the exam table due to severe low back pain; she was unable to walk without a cane, and even with the cane she ambulated very slowly and dragged her feet; her gait was antalgic; she was unable to heel/toe walk or stand and walk on toes or heels; and she was unable to hop on one leg, or squat and rise. (R. 29, 651). Plaintiff also exhibited reduced pinch strength in both hands and could only grasp and manipulate objects with difficulty. More specifically, she was unable to open a door using a knob, squeeze a blood pressure cuff bulb, pick up a coin, flip the pages of a magazine, button/unbutton, zip/unzip, or tie her shoelaces, and she had mild difficulty picking up and holding a cup or pen. (R. 29, 656-57). Dr. Rafiq assessed severe weakness in Plaintiff's hands, though her hand strength was only slightly reduced at 4/5 and she had normal range of motion in the wrists and elbows. (R. 29, 654, 657). He also noted reduced range of motion in the lumbar spine and a positive Phalen's test (which evaluates carpal tunnel syndrome). (R. 29, 651).

Two days later on June 10, 2019, Plaintiff had an x-ray of the lumbar spine that showed only mild degenerative changes and no acute abnormality. (R. 29, 660). When Plaintiff returned to Dr. Unger on June 20, 2019, her condition had largely returned to

normal aside from her difficulties with lumbar extension, and there was no mention of a cane. (R. 29, 778). At a psychological consultative examination on July 3, 2019, however, Plaintiff was walking with a cane, wearing hand braces, and shifting uncomfortably in her seat. (R. 663). Plaintiff had x-rays of her hands taken on July 13, 2019 but they showed only mild degenerative joint disease. (R. 29, 666-67). And during a follow-up appointment with Dr. Unger on October 31, 2019, Plaintiff reported 50% relief from an L4-L5 LESI administered earlier that month. (R. 29, 1228). Aside from lumbar extension, an exam was entirely normal, but Dr. Unger prescribed a TENS unit. (R. 29, 1229, 1325).

On January 13, 2020, Plaintiff saw Dr. Unger's colleague Randolph Y. Chang, M.D. She reported 50% relief from a November 12, 2019 right L3-S1 RFA, but said her pain was back to its initial state. (R. 1231-33). As was the case over the prior two years, an exam showed: normal neck range of motion; no tenderness to palpation in the neck; normal gait; negative lumbar facet loading; normal lumbar flexion; normal lumbar range of motion; negative straight leg raise tests; negative Faber test; and normal motor function, strength, range of motion, and sensation in the shoulders, elbows, hands, hips, knees, ankles, and feet. (R. 29, 1235). On February 13, 2020, Plaintiff saw internist Cynthia Goldman, M.D., because she had been feeling sick for four days. (R. 1293). She also stated that she could no longer see Dr. Unger due to an insurance issue and wanted to obtain her medications through Dr. Goldman. (R. 1294-95).

On exam, Plaintiff had decreased range of motion in the lumbar spine with point tenderness but normal gait, strength, and sensation. Dr. Goldman assessed acute sinusitis and L4-L5 disc bulge. (R. 1294). Plaintiff returned to Dr. Goldman for medication

12

refills in March, April, May, June, August, and September 2020.  At each exam, her gait was normal with good muscular coordination and strength bilaterally, though she had some decreased range of motion and point tenderness in the cervical and lumbar spine, and positive Phalen's and Tinel's signs.  (R. 29-30, 1271, 1288, 1291, 1320).

The ALJ discussed these records and reasonably concluded that the routinely normal or minimal examination findings are inconsistent with the extreme functional limitations set forth by Dr. Unger.  *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) (an ALJ may decline to credit a treating physician's opinion "when the opinion is inconsistent with the physician's treatment notes."); *Alejandrina A. v. Kijakazi*, No. 20 C 4089, 2023 WL 2539239, at *12 (N.D. Ill. Mar. 16, 2023) (citing *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021)) (ALJ properly discounted treating physician's statement that was "inconsistent with other objective evidence in the record.").  Plaintiff largely ignores the normal findings and urges the Court to focus instead on her very poor functioning during the July 8, 2017, July 22, 2017, and June 8, 2019 consultative evaluations.  (Doc. 21, at 11; Doc. 28, at 9-10).

To begin, "Plaintiff's argument does precisely what it accuses the ALJ of doing: Plaintiff points to favorable facts that could support a disability finding while ignoring the unfavorable substantial evidence the ALJ relied on." *Melissa G. v. Saul*, No. 18 C 50218, 2019 WL 4392995, at *3 (N.D. Ill. Sept. 13, 2019).  Moreover, the ALJ fairly addressed and discounted the results from the consultative evaluations given that exams performed shortly before and afterwards were generally normal aside from some difficulties with lumbar range of motion and extension.  (R. 32).  In such circumstances, the mere fact that Drs. Aisien and Rafiq deemed Plaintiff's effort and cooperation to be "satisfactory"

does not establish that Dr. Unger's opinion was consistent with or supported by the record. (R. 478, 652).

Plaintiff finds it significant that Dr. Unger repeatedly diagnosed her with back pain, lower back pain, myofascial pain syndrome, and lumbar spondylosis with myelopathy." (Doc. 21, at 11, citing R. 587, 594, 601, 608, 613, 633, 772; Doc. 28, at 8). Of course, "[Plaintiff] having been diagnosed with these impairments does not mean they imposed particular restrictions on her ability to work. . . . It was [Plaintiff]'s burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018). Here, Plaintiff complained about leg, back, and wrist pain and received LESIs and RFAs, but none of this demonstrates that she is barely able to sit, stand, walk, lift, carry, or concentrate, particularly since contemporaneous evaluations were largely unremarkable.

Given the discrepancies between Dr. Unger's assessment and the objective evidence, the ALJ reasonably relied on the opinions from the state agency consultants. On August 9, 2019, James Madison, M.D., determined that Plaintiff can: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand, and walk for about 6 hours in an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, and crawl. (R. 53-54). Calixto Aquino, M.D., affirmed that assessment on December 18, 2019 but added a limitation to frequent as opposed to occasional climbing of ramps and stairs. (R. 67-69). The ALJ found both opinions persuasive and even imposed additional manipulative, postural, and environmental restrictions based on the overall record. (R. 31). *See Wilson v. Berryhill*,

737 F. App'x 286, 290 (7th Cir. 2018) ("An ALJ has substantial discretion regarding which doctor to believe."). Notably, Drs. Madison and Aquino considered Dr. Rafiq's June 8, 2019 exam, and Dr. Aquino expressly concluded that it was not supported by the evidence. (R. 47, 49-50, 61, 69). Plaintiff does not challenge this aspect of the ALJ's decision.

Viewing the record as a whole, the ALJ did not err in rejecting Dr. Unger's opinion that Plaintiff suffers from extreme functional limitations. The ALJ built an "accurate and logical bridge" between the evidence and this conclusion, and Plaintiff's request to remand the case for further consideration of the issue is denied. *Marilyn C. v. Kijakazi*, No. 20 C 1816, 2023 WL 1862988, at *9 (N.D. Ill. Feb. 9, 2023) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

### 2. RFC

Plaintiff next argues that the RFC fails to account for her manipulative limitations, her need to use a cane, her obesity, or her migraine headaches. A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Anna-Marie L. v. Kijakazi*, No. 21 C 50354, 2022 WL 4610120, at *2 (N.D. Ill. Sept. 30, 2022) (quoting *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012)). "Both the RFC assessment and the hypothetical question posed to the [VE] must include all of a claimant's limitations supported by the medical record." *Joshua J. H. v. Kijakazi*, No. 21

15

C 837, 2022 WL 2905673, at *2 (N.D. Ill. July 22, 2022) (quoting *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021)).

### a.  Hand Use

Plaintiff first objects to the ALJ's conclusion that she is capable of frequent handling, fingering, and feeling with both hands.  Plaintiff notes that the ALJ rejected Dr. Unger's opinion that she is unable to use her hands, arms, and fingers for more than 25% of a workday, and also declined to accept Dr. Madison's and Dr. Aquino's conclusions that she has no manipulative limitations at all.  (R. 31, 54, 68, 643).  In Plaintiff's view, this left an evidentiary deficit that the ALJ improperly filled with his own lay medical opinion. (Doc. 21, at 4-5; Doc. 28, at 2).  This Court disagrees.

As discussed, the ALJ's thorough review of the record showed that at most exams between March 9, 2017 and January 13, 2020, Plaintiff exhibited normal strength, sensation, and range of motion in her hands.  Plaintiff once again stresses that during the July 6, 2017 and June 8, 2019 consultative examinations she was so impaired that she could not even perform such basic activities as opening a door using a doorknob, tying her shoelace, or using a zipper or button.  (Doc. 21, at 6-7).  Mere weeks before and after those evaluations, however, Plaintiff had normal hand strength and functioning.  (R. 28-29, 498, 501, 773, 778).  Plaintiff also reported good relief from carpal tunnel injections. (R. 28, 586 (75% relief), 772 (50% relief)).  The ALJ reasonably determined from these records that Plaintiff's carpal tunnel syndrome is a severe impairment that limits her to frequent as opposed to constant hand use.  (R. 33, 36).

Plaintiff stresses that beginning in March 2020, she started presenting to Dr. Goldman with positive Tinel's and Phalen's signs, including during appointments on

March 9, April 6, August 25, and September 22, 2020. (Doc. 21, at 7; R. 30, 1271, 1288, 1291, 1320). Yet Dr. Goldman simply prescribed oxycodone/acetaminophen and Plaintiff saw her solely for medication refills. (R. 1269, 1279, 1282, 1287, 1290, 1318). Again, Plaintiff offers no explanation for how this demonstrates an inability to frequently use her hands. *Compare Catania v. Astrue*, No. 11 C 4675, 2013 WL 441171, at *9 (N.D. Ill. Feb. 4, 2013) (ALJ did not adequately explain why plaintiff with bilateral carpal tunnel syndrome could frequently (and not occasionally) reach and finger where physicians had recommended that the plaintiff undergo surgery on both wrists).

Moreover, as Plaintiff notes, the VE identified two jobs available to someone with her background and RFC that require only occasional use of the hands (meaning "occurring from very little up to one-third of the time," SSR 83-10): furniture rental clerk (52,600 positions available nationally), and investigator (6,400 positions available nationally). (Doc. 21, at 6) (citing R. 1362-63). Thus, even assuming that the evidence supports a limitation to occasional and not frequent hand use, there are still a significant number of jobs (59,000) available to Plaintiff. *See Milhem v. Kijakazi*, 52 F.4th 688, 696-97 (7th Cir. 2022) (citing cases) (finding 89,000 national jobs significant, and observing that the ruling was "in accord with the numbers of national jobs held to be significant by other circuits," namely, 32,000, 25,000, and 10,000). Courts "will not remand a case to the ALJ for further specification where [they] are convinced that the ALJ will reach the same result." *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021) (internal quotations omitted).

### b. Use of a Cane

Plaintiff argues that reversal is still warranted because the ALJ erred in finding that she does not need to use a cane. (Doc. 21, at 7-8; Doc. 28, at 5-6). Plaintiff first notes that Dr. Unger prescribed her a cane on May 23, 2019. (R. 1326). Oddly, however, Dr. Unger made no mention of a cane in his treatment note that day and assessed Plaintiff with a normal gait. (R. 30, 773). In fact, Dr. Unger never documented ambulatory problems or indicated that Plaintiff needed or used an assistive device during any of her appointments between July 12, 2017 and October 31, 2019. Plaintiff stresses that at consultative exams on July 22, 2017, June 8, 2019 and July 3, 2019, she walked slowly with an antalgic gait even while using a cane. (R. 488, 651, 663). The ALJ acknowledged this evidence, along with Plaintiff's testimony that she needs the cane for balance. (R. 30). But the ALJ also noted that Plaintiff did not use or need a cane two weeks before or after those appointments, walking with a normal gait on July 12, 2017, August 16, 2017, February 28, 2019, June 20, 2019, and September 26, 2019. (R. 30, 32, 501, 567, 634, 778, 781). In addition, Drs. Madison and Aquino considered that Plaintiff used a cane during her consultative examination, but found no "objective evidence to substantiate its usage." (R. 54, 69). As discussed, the ALJ reasonably found these opinions persuasive. Finally, during appointments with Dr. Unger and Dr. Chang on October 31, 2019 and January 13, 2020, Plaintiff affirmatively denied having any problems with prolonged walking. (R. 30, 1228, 1234).

Once again, Plaintiff's poor presentation at the consultative examinations is undermined and outweighed by her normal gait at every other medical appointment. (R. 30). Viewing the record as a whole, the ALJ's conclusion that use of a cane is not a

medical necessity is supported by substantial evidence. *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154) ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

### c. Obesity

Similarly unavailing is Plaintiff's objection that the case must be remanded because the ALJ did not adequately consider the effects of her obesity. (Doc. 21, at 8-9; Doc. 28, at 6). The ALJ acknowledged that Plaintiff's body mass index ranged from 32.45 to 35.90, determined that obesity is a severe impairment at step two of the analysis, addressed obesity at step three of the analysis, and expressly stated that he considered obesity in combination with Plaintiff's other impairments. (R. 23, 26, 30-31). Plaintiff wants more, speculating that her lumbar degenerative disc disease "would likely be affected by body weight." (Doc. 21, at 9). This argument fails because Plaintiff has not identified any physician who imposed additional functional restrictions related to her obesity. *See Brumbaugh v. Saul*, 850 F. App'x 973, 976 (7th Cir. 2021) (no error in assessing obesity where the ALJ acknowledged the condition and "medical records do not show that [the plaintiff] suffers from any obesity-induced limitations.").[5]

Notably, Drs. Madison and Aquino were aware of Plaintiff's obesity and still found her capable of light work. (R. 46, 59). The ALJ adopted that assessment and imposed even greater postural and environmental restrictions. (R. 26, 31). Absent any credible evidence that Plaintiff has greater limitations from her obesity than those identified by the ALJ, her request to remand the case for further consideration of the issue is denied. *See*

---

[5] Dr. Unger imposed greater limitations but did not identify obesity as one of Plaintiff's diagnoses. (R. 641).

*Lynida W. v. Saul*, No. 19 C 2021, 2020 WL 2542156, at *4 (N.D. Ill. May 19, 2020) (quoting *Shumaker v Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015)) (ALJ properly considered the plaintiff's obesity where the plaintiff "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments.").

### d. Migraine Headaches

Plaintiff finally argues that the RFC is flawed because the ALJ did not fairly consider her migraine headaches. (Doc. 21, at 8; Doc. 28, at 6-7). The ALJ found that Plaintiff's migraine headaches are a severe impairment at step two of the analysis, and limited her to moderate noise environments. (R. 23, 26). Plaintiff says the ALJ erred by failing to link this restriction to her headaches, noting that "no records indicated that the headaches were triggered or exacerbated by noise." (Doc. 21, at 9). The ALJ's discussion could have been more fulsome, but he clearly considered pertinent medical records, including an August 14, 2018 note from Dr. Kanashiro indicating that Plaintiff's migraine headaches were stable with sumatriptan, diclofenac, and naproxen. (R. 30, 557).

Additional records show that Plaintiff only complained of migraines a few times when she was dealing with allergies or upper respiratory illness. On November 26, 2018, Plaintiff went to Dr. Katz (the ENT) complaining of a frontal headache and sinus pressure. (R. 1203). Dr. Katz assessed seasonal allergic rhinitis, among other things not relevant here. (R. 1205). Plaintiff next saw Dr. Katz on February 11, 2019 to review an allergy test. She complained of headaches in the mid-forehead with coughing and increased nasal congestion. (R. 30, 1211). Dr. Katz added sinusitis to the list of diagnoses and

20

prescribed an antibiotic. (R. 1213). In April 2019, Plaintiff still had congestion and a frontal headache, and she told Dr. Goldman that she had been sick for nearly two weeks. (R. 28, 674, 1219). Dr. Goldman assessed acute sinusitis and prescribed another antibiotic. (R. 674). There is no further mention of headache concerns or treatment in the record (aside from routine medication management), and Plaintiff fails to explain how the cited notes demonstrate disabling limitations. Nor does she identify any physician who imposed migraine-related restrictions, much less ones beyond those set forth in the RFC. Notably, to the extent Plaintiff suffers from sinus-related headaches, the ALJ limited her to no more than occasional exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 26).

Plaintiff counters with her own testimony that she experiences migraines three times per week lasting up to 30 minutes. (Doc. 21, at 9) (citing R. 1347). The ALJ did not explicitly address this testimony but to the extent the omission constitutes error it was harmless given Plaintiff's minimal complaints of headache pain to her physicians and evidence that she was stable with medication. *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("An error is harmless . . . if we are convinced that the ALJ would reach the same result on remand.").

Courts are to review ALJ decisions holistically and "should not nitpick [those decisions] in quest of a perfect opinion." *Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022) (internal citation and quotations omitted); *Zellweger v. Saul*, 984 F.3d 1251, 1254-55 (7th Cir. 2021). The ALJ could have been clearer about which limitations he included in the RFC to account for Plaintiff's headaches, and done a better job of addressing her testimony on the subject. Nevertheless, in light of the objective evidence and the fact that

no physician of record imposed any migraine-related limitations, the ALJ did not commit reversible error in assessing that impairment. *See Simons v. Saul*, 817 F. App'x 227, 230 (7th Cir. 2020) ("While the ALJ's opinion was not as fulsome as others we have reviewed, it was adequate."). Plaintiff's request to remand the case for further consideration of her headaches is denied.

### e.    Summary

Viewing the record as a whole, the ALJ reasonably determined that Plaintiff can frequently use her hands and does not need a cane, and he properly considered any limiting effects of her obesity and migraines. The RFC assessment is supported by substantial evidence and the case need not be remanded for further analysis.

### 3.    Subjective Symptom Evaluation

Plaintiff's final basis for seeking remand is that the ALJ failed to properly consider her subjective statements regarding her limitations. In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)).

"As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

Plaintiff testified that she cannot work full time primarily due to chronic pain caused by disc disease, asthma, obesity, and carpal tunnel syndrome. (R. 27, 1341). She takes a variety of medications to help control the pain, including Imitrex and sumatriptan for headaches, oxycodone, meloxicam, and gabapentin. (R. 1341-42, 1347, 1353). Plaintiff stated that her memory is affected by her medications and on bad days, her sister has to drive her to work. (R. 1343, 1346-47). Plaintiff's sister also helps her take a shower and comb her hair because she cannot lift her hands over her head. (R. 1339). Plaintiff estimated that she can walk for 25 to 30 minutes before needing to rest due to leg and back pain, and she cannot wash dishes for more than five minutes because her hands start cramping. (R. 1350-51). She does not do laundry because she cannot use the stairs. (R. 1339).

The ALJ first discounted Plaintiff's statements because they were inconsistent with the routinely normal or minimal objective findings. (R. 27-29, 32). The Court finds no error in this determination. *See Gwendolyn B. v. Saul*, No. 20 C 3244, 2021 WL 1812879, at *8 (N.D. Ill. May 6, 2021) (quoting *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018)) ("[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). Plaintiff suggests that the ALJ should have considered the possibility

23

that her condition was so poor during consultative examinations because her symptoms are more severe on some days than others, which demonstrates that she cannot sustain fulltime work. (Doc. 28, at 12). This hypothetical scenario – that all of Plaintiff's bad spells occurred when she was being evaluated for purposes of disability – is not something the ALJ reasonably should have anticipated or addressed. *See Deborah B. v. Saul*, No. 20-CV-725-SMY, 2022 WL 831830, at *6 (S.D. Ill. Mar. 21, 2022) (quoting *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)) ("Applicants for disability benefits have an incentive to exaggerate their symptoms.").

The ALJ also noted that Plaintiff received only routine and conservative treatment. (R. 32). *See Edward H. v. Kijakazi*, No. 20 C 3847, 2023 WL 2683171, at *10 (N.D. Ill. Mar. 29, 2023) (citing *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)) ("As a general matter, an ALJ is entitled to consider the routine and conservative nature of a claimant's treatment in assessing the claimant's credibility."). During the relevant period, Plaintiff had physical therapy, took prescribed medications, and underwent injections, all of which have been deemed conservative measures. *See Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) ("Prill's treatment – injections, orthotics, and physical therapy – was conservative."); *Frank S. v. Kijakazi*, No. 20 C 3429, 2022 WL 832660, at *8 (N.D. Ill. Mar. 21, 2022) ("The Seventh Circuit has consistently affirmed that conservative treatment consisting of pain medications and injections is a proper reason to discount a claimant's symptom allegations."); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (characterizing prescription pain medication, physical therapy, and epidural steroid injections for back pain as conservative treatment). Finally, the ALJ properly acknowledged Plaintiff's testimony that her sister helps with household chores (R. 27),

and did not "equate [her] ability to perform certain activities of daily living with an ability to work full time." *Burmester*, 920 F.3d at 510.

Plaintiff cites other reasons the ALJ gave for discounting her testimony that she believes are flawed. For example, the ALJ discussed notes showing Plaintiff was not in "acute distress" at several appointments, which Plaintiff says merely indicated that "she was not in danger of becoming unstable within the next five minutes." (Doc. 21, at 14) (citing *Wanserski v. Colvin*, No. 1:14-CV-1033-DKL-JMS, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015)). In addition, the ALJ stated that Plaintiff got relief from steroid injections, but Plaintiff says the relief was impermanent. (*Id.*) (citing R. 593, 608). Even assuming that these reasons are improper, the Seventh Circuit has held that "[n]ot all of the ALJ's reasons [for rejecting a claimant's testimony] must be valid as long as *enough* of them are . . ." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original). Here, the ALJ provided several good reasons for discounting Plaintiff's subjective statements regarding her pain, and even gave her the benefit of the doubt in concluding that she has an RFC for light work with greater postural, manipulative, and environmental limitations than those set forth by the state agency consultants. *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. Aug. 13, 2010) (finding no error where "[i]t was because of and not in spite of [the claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record.").

"The ALJ's credibility assessment need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. April 10, 2014) (citing *Schreiber v. Colvin*, 519 Fed. App'x 951, 961 (7th Cir. 2013)). Viewing the record as a whole, the ALJ's assessment of Plaintiff's subjective statements was not

patently wrong and her request to remand the case for further consideration of this issue is denied.

## CONCLUSION

For reasons stated above, Plaintiff's request to reverse or remand the case is denied and the Commissioner's Motion for Summary Judgment [26] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: October 27, 2023

SHEILA FINNEGAN
United States Magistrate Judge